**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TRANSPERFECT HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Complaint No. |
| | ) | |
| ROBERT PINCUS, and CREDIT SUISSE | ) | |
| SECURITIES (USA) LLC, | ) | [JURY TRIAL DEMANDED] |
| | ) | |
| Defendants. | ) | |

## Nature of the Action

This action arises out of the deceitful conduct of Defendants Robert Pincus and Credit Suisse while acting in their respective roles as court-appointed Custodian and the Custodian's financial advisor in connection with a judicially ordered auction. As Custodian, Pincus supplanted conventional wisdom, and the advice of his independent advisors, with his own judgment, orchestrating an ill-advised but highly profitable (for Defendants) auction process to sell TransPerfect Global, Inc., the company entrusted to his custody. When the auction failed to produce bids materially better than those Plaintiff's principals had made pre-auction, Pincus had to act to justify the tremendous cost of the auction and preserve his reputation. He and Credit Suisse then misrepresented to Plaintiff that there were higher value bids requiring Plaintiff to bid $70 million more to win the auction. In reality, Plaintiff already was the highest value bid and had won the auction without the need for any price improvement. Relying on the misrepresentations and omissions of Pincus and Credit Suisse, Plaintiff raised its bid by $70 million to purchase the

TransPerfect shares and suffered actual economic loss as a direct and proximate result.  Plaintiff

seeks to recover for its economic loss through this action.

## Parties

1.     Plaintiff TransPerfect Holdings LLC ("Holdings"), formerly known as PRS Capital

LLC, is a New York limited liability company, which at all relevant times conducted business in

the City, County and State of New York and is the exclusive owner of TransPerfect Global, Inc.

("TPG" or the "Company").  Holdings purchased the shares of TPG in May of 2018.   Holdings is

owned ninety-nine percent (99%) by Philip Shawe and one-percent (1%) by Shirley Shawe.

2.     Defendant Robert B. Pincus ("Pincus" or "Custodian") was, at all relevant times,

an attorney and partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP

("Skadden"), in Skadden's Wilmington, Delaware office. Upon information and belief, Pincus

now resides and works in Washington, District of Columbia.  Pincus was appointed as Custodian

by the Delaware Court of Chancery to conduct a sale of TPG (the "Auction"), retaining his

management authority over the company pending the sale.

3.     Upon information and belief, Credit Suisse Securities (USA) LLC is a Delaware

LLC that was hired by Pincus to serve, by and through its Chicago and New York City offices, as

TPG's exclusive financial advisor in connection with the sale of the Company.

## Relevant Non-Parties

4.     TPG is the world's largest provider of language services by revenue and maintains

its headquarters in New York City, New York.  It currently employees approximately 7000 full-

time employees, with more than 100 offices throughout the world.  The Company has a network

of more than 25,000 translators, editors and proofreaders working in approximately 170 different

languages.

5.      Philip Shawe ("Shawe") is a co-founder and the Chief Executive Officer of TPG, and the Managing Member of Holdings (in which he owns ninety-nine percent of the membership interests).  At all relevant times, Shawe was acting on behalf of Holdings as a participant in the Auction, and statements made to Shawe and his agents were made to these individuals in their capacity as representatives of Holdings.

6.      Elizabeth Elting ("Elting") is a co-founder of TPG and was a fifty-percent (50%) owner of TPG until Holdings purchased her shares in May 2018.

7.      Houlihan Lokey, Inc. ("Houlihan") is a California corporation that the Custodian hired as a financial advisor to assist him in identifying and analyzing sale alternatives. That same Houlihan team later switched sides and became the financial advisor to H.I.G. Capital ("H.I.G.") as a bidder in the auction process.

8.      Upon information and belief, H.I.G. is a Delaware limited liability company with its principal place of business in Miami, Florida.   H.I.G. is a private equity and alternative assets investments firm.  In 2017, H.I.G., through one of its investment funds, participated as a bidder in the Auction run by Defendants to sell TPG.

9.      Blackstone Inc. ("Blackstone") is a publicly traded company registered on the New York Stock Exchange.  It operates a number of investment funds through which it makes private equity investments.  Blackstone is incorporated in Delaware and has its principal place of business in New York.  In 2017, Blackstone partnered with Elting and participated as a bidder in the auction run by Defendants to sell TPG.

## Jurisdiction and Venue

10.     This Court has original jurisdiction pursuant to 15 U.S.C. § 78aa, 28 U.S.C. §1331 and 15 U.S.C. § 78cc(a).

11.     Venue is proper pursuant to 28 U.S.C. §1391 and  Section 12.11 of the SPA governing the sale of securities at issue herein, which provides that "each party hereby agrees and irrevocably consents … to be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware in and for New Castle County, or if the Court of Chancery lacks subject matter jurisdiction over the dispute, in any state or federal court having jurisdiction over the matter situated in New Castle County."

### Relevant Facts

12.     Shawe and Elting were the co-founders and the controlling shareholders of TPG until May 2018.

13.     In May 2014, Elting filed a petition in the Court of Chancery seeking the dissolution and forced sale of TPG based on alleged director and shareholder deadlock.

14.     In August 2015, the Court of Chancery issued an unprecedented Order appointing a custodian and directing that TPG, a highly profitable company, be sold as a going concern. Chancellor Bouchard appointed Pincus to oversee the judicially ordered sale of the Company.

15.     In October 2015, Pincus hired Houlihan as a financial advisor to analyze sale alternatives.

16.     In or around mid-December 2015, Houlihan sent a draft report to Pincus that included four possible options to sell the Company and – as expected – favored a sale process directly between the existing shareholders as most viable.  A "modified auction," in which existing shareholders would compete against "financial" bidders (such as investment banks or private equity funds) and "strategic" bidders (competitors or investors with holdings in the same competitive space), was not included in Houlihan's draft.

4

17.     On December 13, 2015, Pincus responded to Brian McDonald of Houlihan with revisions and an outline of a different process in which he would run a modified auction "by [himself], without participation on the sell side by Shawe or Elting…"   Thereafter, Pincus and Skadden played a major role in formulating and drafting Houlihan's report.  The concept of a "modified auction" was ambiguous enough to allow Pincus to conduct a broad auction (which Houlihan's analysis found unacceptably risky) under the guise of a narrower, more closed process. This formulation promised to and did generate tens of millions of dollars in fees for Pincus, Skadden and Pincus' advisors.

18.     On or about February 8, 2016, Houlihan finalized its report (the "Report"), recommending a modified auction approach that, according to the report, was dependent on an ungranted, court-imposed post-sale competition restriction upon Shawe and Elting to succeed. The modified auction was the most expensive and risky of the options presented by Houlihan.

19.     The same day, Pincus submitted a proposed plan of sale (the "Sale Plan") based on the Report to the Court of Chancery.  In the cover letter to the Court of Chancery, Pincus misrepresented that his expert, Houlihan, was an "independent advisor."

20.     Pincus failed to reveal to the Court of Chancery the material role he and Skadden had played in creating the Sale Report and, specifically, that he had dictated the conclusion and pressured Houlihan to deemphasize the merits of the one-on-one process – that is, an auction involving just the existing owners and their partners.

21.     On July 18, 2016, the Court of Chancery issued a sale order (the "Sale Order"), based largely on the Sale Plan, which adopted the Custodian's recommendation for a modified auction, but declined to impose the non-compete against Shawe and Elting upon which the recommendation was based.   The Court of Chancery noted that "but for" the supposedly

independent Report, it was inclined to have an auction between the shareholders. Even after the Court of Chancery clarified its position, Pincus failed to inform the court that he and his Skadden lawyers had steered the Report's conclusion and exerted editorial control over its language.

22.     The Sale Order explicitly mandated that the form of consideration paid by the buyer in the sale process be limited to "cash and marketable securities."

23.     In the end, as explained further below, Pincus achieved his true goal – he ran a costly "broad auction" with 92 participants and made many tens of millions of dollars for himself, Skadden and his advisors in the process.  The results of that auction were clear by November 8, 2017, but Pincus and Credit Suisse sought to extract more from Holdings through misstatements and omissions.  Through their actions, Credit Suisse generated a significantly higher advisory fee, and Pincus created a reputation-saving result which permitted him to receive further appointments for similar engagements as custodian or special master.

24.     On November 16, 2016, Pincus hired Credit Suisse (a Skadden client) to act as TPG's financial advisor.  Continuing to act in his own self-interest, he passed over less-expensive alternatives.  Pincus also sidestepped the board approval process altogether and engaged Credit Suisse unilaterally on behalf of the Company.

25.     In late summer 2016, Pincus started actively negotiating a proposed sale solution with Shawe's attorney, former SEC Chairman Jay Clayton, who was then in private practice at Sullivan & Cromwell LLP. Pincus continued to make demands and give concessions until mid-to-late December when he demanded that Shawe agree to the then-current terms on the table and provide proof of financing, abruptly telling Shawe's counsel "I have no interest in engaging in further discussions with respect to new proposals intended to further restrict my judicially designated power and authority to run a sale process."

26.     Shawe complied and immediately spent more than $1 million in two weeks to secure sufficient financing to fund the offer demanded by the Custodian (the "Co-Founder Offer").

27.     Unlike the Auction, which required a newly imposed restrictive covenant on Shawe to succeed—which covenant was valued at $200 million—the Co-Founder Offer worked with existing conditions and avoided the unnecessary costs, expense, uncertainty, internal disruption, disclosure of information to competitors, and other negative effects of a full auction.  The Co-Founder Offer started with an enterprise value of $640 million and would have permitted bids from those firms that participated in the Auction at a fraction of the cost.

28.     However, Pincus reneged on his deal with Shawe.  He abandoned the solution of a Co-Founder Offer, which would have resulted in a speedier, more economical, secure, and efficient manner of selling the Company, while still permitting the Custodian to ensure that the selling shareholder(s) would receive maximum value for the shares through a "go-shop" mechanism.   In its place, he moved forward with an Auction.

29.     Neither Credit Suisse nor Pincus disclosed to Shawe that Credit Suisse client H.I.G. had already made strong overtures to Credit Suisse and Pincus to purchase TPG and that Credit Suisse had identified H.I.G. as "our buyer."

30.     Credit Suisse and Pincus devised a sale process with three discrete rounds of bidding.   As is set forth more fully below, along the way they changed the rules and added more rounds of bidding to create the false impression that there was real price competition in the Auction.

31.     During Phase I of the sale process, approximately 92 potential participants were identified and invited to bid.   The sheer number of participants invited made clear that the

"modified" Auction was a broader process and more expensive process than the one for which Pincus had obtained approval from the Court of Chancery.

32.     H.I.G. participated in the auction process despite the Court of Chancery's clear rejection of Houlihan's proposed non-compete provisions, and submitted bids that were conditioned on the inclusion of such a provision.  H.I.G. incorporated such defiant conditions because Pincus and Credit Suisse had misrepresented that the Court of Chancery was likely to impose further covenants and restrictions on Shawe, notwithstanding the Sale Order.

33.     At or about this time, Shawe approached Pincus and indicated that he was willing to engage in a "shotgun" auction with Elting if Pincus would permit it.  Specifically, Shawe informed Pincus that to avoid the cost of the Auction (in terms of fees and damage to the company) he was willing to offer to buy Elting's shares or sell his shares to Elting for $350 million.  That is, Shawe valued TPG at $700 million and again offered to resolve the matter without running a costly Auction.  Pincus, standing to make millions for himself, Skadden and his advisors, refused to engage with Shawe's offer in favor of running the Auction.

34.     On July 13, 2017, H.I.G., Shawe (acting for Holdings), and Elting, and other financial institutions submitted indications of interest for TPG, concluding Phase I of the Auction.

35.     H.I.G.'s initial "indication of interest" was $750 million.

36.     Credit Suisse and the Custodian chose ten bidders (including Holdings, Blackstone in partnership with Elting, and H.I.G.) who had submitted indications of interest in Phase I to advance to Phase II.

37.     Credit Suisse's Phase II bid solicitation letter explicitly stated that the transaction could not be conditioned on either the imposition of a restrictive covenant on the shareholders, or upon resolution of any litigation involving TPG or the Custodian.  It also required that the bid

amount reflect what each bidder was willing to pay in cash or marketable securities at closing (as required by the Sale Order), and that any material conditions, assumptions or qualifications should be disclosed with the bid.

38.     Notwithstanding the stated rules of the sale process prescribed by Pincus, he and Credit Suisse removed the requirement that bidders demonstrate committed financing in the Phase II bidding.  The removal of this condition permitted H.I.G. to remain in the Auction without having to incur the expense of obtaining committed financing – an obstacle that Credit Suisse knew H.I.G. likely would not be motivated to overcome.  It also removed a crucial safeguard against bid inflation, since a proof-of-financing requirement would have required H.I.G. and other Phase II bidders to justify their bid values to the third-party lenders from whom they had sought financing commitments.

39.     At the conclusion of Phase II, H.I.G. prepared a written offer, which it submitted on September 7, 2017.   H.I.G.'s Phase II bid of $750 million was the same headline amount of the bid it made in Phase I, but H.I.G. did not disclose its intended closing conditions (e.g., an earnout intended to be a non-compete against Shawe).

40.     On September 7, 2017, Shawe submitted Holdings' Phase II bid of $765 million, which he was led to believe was necessary in order to advance to the next round.  Holdings' higher bid prompted Pincus and Credit Suisse to alert H.I.G. that it needed to increase its nominal bid to remain in the Auction – adding a private rebid round specifically for H.I.G. (other bidders who had made higher initial Phase II bids were prevented from advancing, without being given any opportunity to rebid).

41.     Upon information and belief, Pincus emphasized the uncommitted nature of the bidding process to H.I.G. anticipating that the firm would simply raise its Phase II bid to stay in the Auction.

42.     Seizing on the fact that it would not be held to an inflated bid, H.I.G. threw out a number it never intended to honor with cash or marketable securities at closing.  Specifically, H.I.G. inflated its headline bid to $900 million – without disclosing the material conditions that it would later use to reduce the real value of its bid.

43.     Pincus improperly permitted H.I.G. to continue in the Auction to create the false appearance of a competitive dynamic.

44.     Pincus knew that H.I.G.'s $900 million bid was not real.

45.     On September 21, 2017, Credit Suisse and Pincus invited four bidders (Blackstone with Elting, Cerberus, H.I.G., and Holdings) to provide a markup of a form Securities Purchase Agreement by October 30, 2017, and to submit a final bid by November 8, 2017.

46.     Cerberus resigned from the Auction citing that it could not proceed given the reality that the Company would not be sold with a non-compete on the co-founders.

47.     Blackstone meanwhile refused to continue in the process unless certain of its fees were reimbursed by Pincus.  Therefore, Credit Suisse convinced Pincus to reimburse up to $4 million of Blackstone's diligence fees, to induce Blackstone to remain in the process and, thereby create a second shill bid with which to defraud Shawe.

48.     At Credit Suisse's urging, Pincus promised Blackstone that TPG would subsidize Blackstone's participation in the auction – paying it up to $4 million of TPG's money – to maintain the façade of a competitive Auction.  Pincus agreed to pay this money, knowing that Blackstone's

bid was not competitive because of a significant financial conditions and an insistence on non-compete agreements that violated Auction rules.

49.     Pincus subsidized Blackstone's participation, and led H.I.G. to believe that it could include bidding terms prohibited by the Court of Chancery, so that he could artificially "maximize value," to procure sham bids and drive-up Mr. Shawe's purchase price.

50.     Upon information and belief, despite Credit Suisse's role in the auction, Pincus permitted H.I.G. and Credit Suisse to pursue a direct financing arrangement in Phase II of the Auction and allowed those negotiations to continue into Phase III.  In this way, Pincus kept H.I.G. in the Auction as a bidder despite its serious financing limitations.  However, Credit Suisse later terminated the underwriting process in late October 2017 when potential exposure created by the inquiries regarding conflicts of interest were raised in the Court of Chancery made it necessary to abandon the financing.

51.     As of October 27, 2017, H.I.G. still lacked sufficient financing to underwrite a $900 million bid and its principals recognized that they had "some wood to chop next week with lenders."

52.     Pincus continued to encourage H.I.G.'s participation in the Auction while ignoring conditions attached to H.I.G.'s bid that substantially reduced its value or did not comply with the Auction rules.  Pincus was silent with respect to the earnout and closing conditions contained in H.I.G.'s October 30, 2017 markup of the draft securities purchase agreement, which were incompatible with the Court of Chancery Sale Order requiring consideration in the form of "cash and marketable securities," despite multiple opportunities to discuss these provisions with H.I.G..

53.     In a November 2, 2017 email, Skadden, copying Pincus, provided H.I.G. with Pincus' feedback on H.I.G.'s mark-up.  This feedback contained no mention of H.I.G.'s earnout

or closing conditions, even though Pincus knew that they would significantly decrease the net value of H.I.G.'s bid.

54.     Four days later, on November 6, 2017, Pincus again failed to mention these conditions during a phone call with H.I.G..  In doing so, Pincus again allowed H.I.G. to remain in the auction despite obvious deficiencies with its bid.  This promoted the illusion that the Auction was competitive and set the stage for Pincus to run up Shawe's bid.

55.     On November 8, 2017, Shawe (acting on behalf of Holdings), Blackstone and H.I.G. submitted Phase III bids with draft proposed securities purchase agreements that specified the terms and conditions of their offers.

56.     H.I.G. submitted an illusory bid that advertised a "headline" value of $900 million (the "First Phase III Bid") but achieved this number through inclusion of conditional and delayed consideration that failed to deliver value to TPG's shareholders.  Specifically, H.I.G. ignored the need to tender its full bid in "cash and marketable securities" by padding its First Phase III Bid with a $100 million non-marketable promissory note.

57.     The economic terms of Holdings' offer were superior to all others on November 8, 2017.  Holdings' offer also provided greater after-tax net proceeds to stockholders at closing than the others.  Because Holdings' offer was admittedly superior to the remaining two bidders both in economic and non-economic terms, Pincus "made the determination to engage Mr. Shawe, because I believed that no other bidder, including Bidder B [H.I.G], likely would offer significantly greater consideration…or provide the limited conditionality and certainty of closing presented by Mr. Shawe's proposal."

58.     By November 8, 2017, based on the draft Securities Purchase Agreements he received, and the communications had with the three bidders then remaining (one of which he had

agreed to pay up to $4 million to remain a bidder), Pincus and Credit Suisse knew that Blackstone was not competitive, that H.I.G. had reached the top of its bidding range, and that Shawe's bid was the best in economic value and certainty.

59.     Pincus knew that Holdings' bid was superior because its valuation required almost no deductions for debt-like items or escrows, and was the most likely to maintain the Company as a going concern without interruptions.

60.     He also knew that H.I.G. was out as a real bidder no later than November 8, 2017, when H.I.G.'s counsel informed him that H.I.G. was "at or near the top end of its price range and was unlikely to agree to a meaningful increase in its offer price."

61.     H.I.G.'s Phase III headline bid of $900 million had many conditions that made the real value of its bid worse than the September 7, 2017 offering, which Credit Suisse had advised was too low.

62.     Pincus assigned no value to the payment in kind bond for $100 million which was part of H.I.G.'s $900 million Phase III headline bid and later admitted that fact directly to Brian McDonald of Houlihan on November 22, 2017. McDonald promptly reported this "feedback from Pincus" to Managing Directors at H.I.G. in an email that stated, among other things, that "Pincus gave zero credit for all conditional payments: seller note, escrow, holdbacks etc." and "Pincus viewed HIG's prior bid as being about $50 million lower than Shawe's."

63.     At this point, on November 8, 2017, the Auction should have concluded and Pincus should have declared Holdings the winner. Instead, faced with the humiliating realization that his costly auction resulted in no greater benefit than Shawe had already offered months before, Pincus and Credit Suisse undertook to extract greater value from Holdings through manipulation and misrepresentation.

64.     Pincus directed Credit Suisse to go through the motions of meeting with the remaining bidders, even though Pincus already knew that the other bidders would not be able to match the non-financial aspects of Holdings' bid.  This effort resulted in bids that were essentially unchanged being submitted again on November 15, 2017.

65.     On November 10, 2017, Credit Suisse suggested to Pincus that they should "guide Phil to '800s'" and Pincus agreed.  Credit Suisse then spoke to investment banker J.T. Atkins, acting as Holdings' agent, and misrepresented that Holdings was the "low bid now" and that Mr. Atkins should "bid his best number to position Phil [Holdings] to win."   Credit Suisse knew that Mr. Atkins would convey this misrepresentation to Shawe.  As expected, Mr. Atkins relayed to Shawe that Credit Suisse had told him Holdings was the low bid and had encouraged a higher bid.

66.     Relying on Credit Suisse's misrepresentation, and believing that there were other bona fide bidders with competitive offers, Shawe raised Holdings' bid to $710 million with the same conditions on November 15, 2017. After these discussions, despite the fact that Holdings' bid was superior in every way (now by an additional $10 million), Pincus acted to move Holdings' bid up further, towards a price of $775 million.

67.     For H.I.G.'s part, on November 15 2017, it raised its "headline" bid to $925 million and achieved that illusory higher offer mostly by raising the amount of the non-marketable promissory note to $125 million (Second Phase III Bid).

68.     Pincus valued the three competing offers of H.I.G., Blackstone and Holdings based on the estimated net proceeds, after tax, to be received at closing by the stockholders. Blackstone's bid contained a $200 million non-compete requirement and was not competitive.  When adjusted to consider only cash and marketable securities, H.I.G.'s First Phase III Bid (November 8) amounted to only a $681.9 million net purchase price and the Second Phase III Bid (November

15) amounted to only a $695.6 million net purchase price.  Both of these bids were below Holdings' initial Phase III Bid (November 8) which amounted to a $704.7 million net purchase price.

69.    Credit Suisse conferred with Pincus on the strategy to deceive Shawe into raising Holdings' bid based on a misrepresentation of bids held from others, and then emailed Pincus a proposed script to use with Shawe.  In an email dated November 10, 2017, Credit Suisse suggested that Pincus misrepresent to Shawe that there was third party a bid that might "get [him] out at a higher value than [he was] proposing…," that they were "clarifying final bids," and that "at a minimum an aggregate bid that is in the 800s range … [825] as an example, is likely to position [his] bid better."

70.    Pincus drafted a handwritten outline of the talking points he would make at a November 16, 2017 meeting arranged with Shawe.   In those points he planned to tell Shawe he was "going to put cards on the table" and then misrepresent to him that "I have bids that are higher than yours [Holdings], including one bid that is substantially higher."   He also planned to threaten Shawe by stating "I think that if I select a bid substantially higher than yours [Holdings'] … I will prevail" and then offer the company to Shawe for $775 million aggregate.  While planning to make these statements, Pincus knew that Holdings' bid was already the highest value after deductions and tax considerations.

71.    On November 16, 2017, Pincus and his counsel met with Shawe and his counsel. During that meeting Pincus read from his prepared notes, and misrepresented to Shawe that he had bids in hand that were of higher value than Holdings' bid.  In sum or substance, Pincus made all of the statements he drafted in his talking points to Shawe, omitting that Holdings' bid already was

the highest value, and deceptively referencing only the headline amounts of other bids to induce Holdings to pay more for the shares of the company.

72.     Based on Pincus' misrepresentation of the amount Holdings would need to pay to win the Auction, Shawe raised Holdings' bid to an aggregate of $770 million.

73.     If Pincus had truthfully recounted the facts to Shawe, without misrepresentation, there would have been no reason for Holdings to increase its bid.

74.     The value of other bidders' bids was exclusively within Pincus' and Credit Suisse's knowledge, and he had a duty to act toward Shawe with candor and fair dealing as an officer of the court.

75.     Pincus also had a duty not to discriminate between TPG shareholders in his conduct and oversight of the auction and was not permitted to deceive Shawe into a bidding posture that would unfairly benefit Elting (and himself) at Shawe's expense.

76.     Shawe relied on the accuracy of the statements Pincus made in the November 16, 2017 meeting and, based upon them, agreed to pay $770 million for TPG, increasing Holdings' bid by $70 million from its November 8, 2017 submission.

77.     Of Course, Holdings' final revised bid of $770 million and the accompanying terms were the most favorable, and on November 19, 2017, the SPA was executed with Holdings as the purchaser.

78.      The SPA was a contract for the purchase and sale of a security for purposes of Section 10(b) of the Exchange Act.

79.     Pincus entered into the SPA, in his capacity as Custodian, with Holdings and Shawe and executed the SPA in the name of, and on behalf of, TPG and Elting.

80.    The SPA contained mutual releases between the "Seller Releasors," as defined

therein, and the "Buyer Releasors," including Shawe and Holdings (the "Release").  In particular,

§ 8.2(b) provides for the release of all "Claims," as defined in § 8.2(a), in relevant part, as follows:

> Effective upon the Closing, each of Parent, Buyer … (the "Buyer Releasors") does, to the
> fullest extent permitted by Law, hereby knowingly waive, fully release and forever
> discharge and covenant not to sue, directly or indirectly on or on behalf of any Person …
> the Custodian, his advisors, agents and representatives, including … Credit Suisse
> Securities (USA) LLC … (the "Buyer Released Parties"), from and with respect to any
> Claims which the Buyer Releasors ever had, now have or which they hereinafter can, shall
> or may have by reason of any matter, cause or thing whatsoever in connection with, arising
> out of, based upon or related to: … (iii) any acts, events, facts, matters, transactions,
> occurrences, statements, or representation, or any other matter whatsoever arising out of or
> related to the Order of the Court, dated March 9, 2015, the Order of the Court, dated August
> 13, 2015, or the Sale Order and any matters contemplated thereby; provided, however, that
> the Claims released hereunder shall not include any claims … (D) that may not be lawfully
> released under applicable law (collectively, the "Buyer Excluded Claims").

81.    The Release was essentially the same as the releases contained in the Form Sale

Agreement that was distributed to the final bidders in October 2017.  *See Elting v. Shawe (In re*

*TransPerfect Global, Inc.)*, 2018 WL 904160, at *25 (Del. Ch. 2018) ("Notably, the Form Sale

Agreement that was circulated to the final three bidders contained an essentially identical

release.").

82.    Pincus and Credit Suisse were not parties to the underlying litigation between

Elting and Shawe, and did not purport to provide any consideration in connection with the sale of

Elting's shares.

83.    At the time of execution of the SPA, Shawe had filed two lawsuits against Pincus

in his capacity as Custodian, neither of which had anything to do with a claim for securities or

common law fraud.

   a.    In *Shawe v. Pincus*, No. 1:17-cv-00277 GMS (D. Del.), Shawe sought declaratory

        and injunctive relief against Pincus and the Secretary of State for the State of

Delaware on the ground that the forced, court-ordered sale of Shawe's shares of TPG violated his rights under the Due Process Clause and the Takings Clauses of the Fifth and Fourteenth Amendments to the Constitution.

b.  In *Shawe v. Pincus*, No. 1:17-cv-06673-WHP (S.D.N.Y), Shawe sought declaratory and injunctive relief for alleged violations of his rights under the Supremacy Clause (Article VI), and the First, Fifth, and Fourteenth Amendments, arising from the actions of Pincus in threatening Shawe with sanctions in retaliation for Shawe's exercise of his constitutional rights, including his rights of free speech and access to the federal courts, and threatening to impose unconstitutional restrictions upon Shawe as a condition to his participation in the auction.

84.  The SPA resolved those pre-existing, non-fraud claims by providing in relevant part in § 8.2(d) that:

> Parent [Phil Shawe] and Shirley Shawe hereby agree that they shall promptly take all actions necessary in order to, prior to the Closing, (i) obtain a stay of all Applicable Litigation, each of which Applicable Litigation shall be automatically dismissed with prejudice upon the Closing, and shall exercise their reasonable best efforts to take or cause to be taken all actions appropriate or necessary to obtain an immediate (and not later than two (2) Business Days after the Closing) dismissal of each such Applicable Litigation with prejudice, including making all appropriate and necessary filings with the Court and any other applicable court, as applicable, ….

85.  At the time of the execution of the SPA, the securities fraud claims that are the subject of this lawsuit were unknown to Holdings and Shawe, were not discovered, and could not with reasonable diligence have been discovered by Holdings and Shawe until documents were produced and depositions were taken in early 2021, as part of the court-scheduled discovery process in a federal trade secret litigation between TPG and H.I.G.

18

86.     The securities claims alleged herein are excluded from the Release by the terms thereof because they could not be lawfully released pursuant to § 29(a) of the Exchange Act, which provides in relevant part that: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of [the Exchange Act] or of any rule or regulation [promulgated] thereunder … shall be void."  15 U.S.C. § 78cc(a).

87.     To the extent that the Release purports to release Defendants from all future liability for such as yet undiscovered claim for violation of § 10(b) and Rule 10b-5, the Release is void pursuant to the § 29(a) anti-waiver provision of the Exchange Act.

88.     The SPA was not negotiated on an arm's length commercial basis but rather the terms of the Release as set forth in the Form Sale Agreement were mandated by Pincus, acting in his capacity as an officer of the Court of Chancery for purposes of conducting the judicially-ordered sale of TPG.  The parties to the SPA therefore lacked equal bargaining power.

89.     Because the Release is void as an impermissible anticipatory waiver of claims for securities fraud, the securities fraud claim that is the subject of this lawsuit is not a "Released Claim" under the SPA or any subsequent order issued by the Court of Chancery based on the SPA.

90.     In seeking approval for the SPA and the sale of Elting's shares in the Company to Holdings, the Custodian disguised his fraud in two ways.

91.     First, during oral argument before the Court of Chancery, Mr. Pincus' counsel misleadingly stated that it was only as of November 19, 2017, that Holdings' bid offered the fewest conditions and best chance of closing, and highest monetary value, based on after-tax net proceeds to shareholders, taking into account the treatment of debt-like items.   This statement was misleading because it was actually as of November 8, 2017 that Holdings' bid met all of these criteria, and Holdings' bid increase of $70 million was not the result of genuine competition.

92.     Second, in arguing for approval of the SPA, Pincus knowingly submitted a false analysis of the respective bids which failed to disclose that he had valued the H.I.G. seller note at zero because it did not qualify as cash or a marketable security.  In fact, on November 22, 2017, Pincus had informed H.I.G. through Brian McDonald that he gave zero credit for the note and that he had valued H.I.G.'s prior bid as being worth $50 million less than Holdings' bid.  Despite this admission, the analysis submitted to the Court of Chancery falsely asserted that the seller note was valued at a slight discount to make it appear that there had been bona fide competition in the bidding.  That misrepresentation to the Court of Chancery prevented Holdings and Shawe from discovering that Holdings had been defrauded.  Only through the subsequent discovery (in a separate case) that Pincus had not in fact credited H.I.G.'s seller note toward the value of its bid did Holdings realize that Pincus had made intentional misrepresentations during the Auction.

93.     By manipulating Holdings into increasing its bid by $70 million, Pincus was able to create the appearance that the Auction was worthwhile and his custodianship not a failure.  This was of tremendous importance to Pincus as he approached Skadden's mandatory retirement age but would soon parlay his experience as the TransPerfect custodian into a lucrative new career.  Pincus now trades on his experience in the TransPerfect case and his reputation among the Delaware judiciary to secure court-appointed positions.  On April 13, 2021, leveraging his experience in the TransPerfect matter, Pincus was appointed to serve as "special master" in *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, 1:17-mc-00151 pending in the U.S. District Court for the District of Delaware, to oversee the sale of Citgo's parent company, indirectly held by Venezuela, to enforce a $1.2 billion award against Venezuela.  Upon information and belief, Pincus' fees in that matter were almost $3.4 million as of May of 2022.  The matter is ongoing and Pincus' significant fees are the subject of ongoing public and private controversy.

**First Claim For Relief**

**Securities Fraud in Violation of 15 USC 78j(b) and 17 C.F.R. 240.10b-5(b)
(against Pincus)**

94.   Holdings repeats and realleges the allegations of paragraphs 1 through 93 above as if fully set forth here.

95.   Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security[,] ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

96.   Rule 10b–5, which was promulgated by the SEC to implement Section 10(b), makes it unlawful for anyone engaged in the purchase or sale of a security:

    a.   To employ any device, scheme, or artifice to defraud,

    b.   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which the were made, not misleading, or

    c.   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b–5.

97.   Pincus sought to create the false impression of a highly competitive auction when in fact Holdings' bid already had the most value.  He misrepresented the value of the competing bids to induce Shawe to raise Holdings' bid $70 million to an artificially inflated amount.

98.   Specifically, in a November 16, 2017 meeting, Pincus made statements to Shawe that strictly followed a script that he had prepared with Credit Suisse.   Pincus told Shawe that he had "bids that are higher than yours [Holdings'], including one bid that is substantially higher."

In the same vein, Pincus continues to state that "if I select a bid substantially higher than yours [Holdings'] … I will prevail" and that he had the option to "sell to a higher bidder and fight for the next six months."

99.     Pincus and Credit Suisse knew that the $100 million seller note comprising a portion of HIG's November 8 bid, and the $125 million seller note comprising a portion of H.I.G.'s November 15 bid, could not be credited toward the value of that bid because the Sale Order limited the "forms of consideration … shall be limited to cash and marketable securities, except as a shareholder may elect."  (par. 2).

100.     Pincus and Credit Suisse knew that the H.I.G. proposed seller note was neither cash nor a marketable security and was ineligible as consideration in the Auction.

101.     Internally Pincus gave no value to the seller note, a position which he conveyed to H.I.G.'s advisors on November 22, 2017.

102.     Pincus and Credit Suisse knew that H.I.G.'s bid could not be accurately described as "substantially higher" because it was in fact worth far less than Shawe's bid because it included a seller note in violation of the Sale Order.

103.     The fact that H.I.G.'s bid involved a seller note that was not cash or a marketable security is information that a reasonable auction participant would find important in determining how much to bid.

104.     Pincus and Credit Suisse also knew that Blackstone's bid contained large escrow amounts tied to the execution of non-compete and non-solicitation agreements by each seller and to cover litigation costs, notwithstanding that such non-compete agreements were specifically excluded from the sale terms.

105.    Shawe had made clear to Pincus that he would never agree to such restrictions and prevailed in the Court of Chancery in opposing Pincus' request that they be imposed as part of the sale plan.

106.    The fact that Blackstone's bid contained a $200 million non-compete and non-solicitation covenant is information that a reasonable auction participant would find important in determining how much to bid.

107.    Having undertaken to make a representation about the amount of competing bids, Pincus had duty to disclose material information regarding those competing bids to avoid misleading Shawe.

108.    Pincus knew that his statements were materially misleading, and intentionally structured them in this way to elicit a higher bid from Shawe in the absence of genuine competition.

109.    Pincus omitted material information necessary to make his statements to Shawe regarding the value of the competing bids not misleading.

110.    Pincus' misrepresentations and omissions at the November 16, 2017 meeting about the value of other "bids" made in the Auction was "in connection with" the sale of a security because it directly influenced Holdings' bid for TPG shares and therefore the purchase price of the shares.

111.    Pincus needed to justify the modified auction process that he had recommended to the Court, knowing that it was not the procedure initially recommended by Houlihan and was not the logical method for conducting the sale, given the circumstances of two co-founders who owned the shares, the absence of non-competes binding on the co-founders, and the fundamental objective of maintaining TPG as a going concern.

112.    Before and during the auction Pincus did not support several offers from Shawe that likely would have resulted in a sale price equivalent to or better than the bid made by Shawe on November 8, 2017, which itself was superior to all other Auction bids in value and certainty.

113.    Pincus' Auction process weakened the competitive position of TPG through a protracted and publicized sale process, which cost the company many tens of millions of dollars of unnecessary fees and expenses, a significant amount of which went to directly benefit Pincus and his law firm.

114.    Pincus' modified auction process (really just a broad auction) was a failure.  Having bilked the company of more than $30 million for himself and his advisors, Pincus actively and knowingly took steps to create the false appearance of a highly competitive process to the Court of Chancery, Elting, Shawe and Holdings, well after he knew that this was not the case.

115.    Knowing that a sale of TPG to Holdings at the November 8th bid price would be viewed as an abject failure by Elting, the Court of Chancery, and everyone involved, especially in light of the huge amounts of money that had been wasted, Pincus elected to hide the Auction result and mislead Holdings.

116.    Pincus continued to mislead Holdings and cover up the true lack of competition by submitting false bid comparison sheets to the Court of Chancery as part of the approval process, which made it appear that Pincus and his agents had placed a higher value on H.I.G.'s bids than was the case.  Specifically, those bid comparisons gave credit for H.I.G.'s seller note with a small discount, when Pincus actually had given the seller note no credit, as required by the Sale Order, and admitted in private conversations with H.I.G.'s advisors at Houlihan.

117.    Pincus knew what other bidders were willing to pay, and Pincus' statements about other bids intentionally misrepresented, or at a minimum were materially misleading as to the price at which Holdings could purchase the shares.

118.    As a direct and proximate result of Pincus' misrepresentations, and omissions of material facts necessarily to correct representations that were otherwise materially misleading, Holdings was induced to purchase TPG's shares at an inflated price and suffered economic loss.

119.    But for these misrepresentations, Holdings would have purchased TPG at the $700 million price of his November 8, 2017 bid, because Pincus would have been constrained by the Sale Order to maximize value by selling to Holdings at this price.

120.    Pincus was aware of the financing structure which Holdings would use to purchase TPG securities because it was outlined in the SPA submitted on November 8, 2017, and knew that the direct and foreseeable consequence of any increase in the sale price to Holdings would be additional unsecured debt borne by TPG itself resulting in a corresponding diminution in the value of TPG shares.

121.    As a direct and proximate result of Pincus' omission of material facts, Holdings suffered damages, including, but not limited to, the $35 million of additional consideration paid for Elting's shares, loss of the value of TPG shares and the costs of this action.

WHEREFORE, Holdings demands judgment in its favor and against Pincus for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Second Claim For Relief

**Securities Fraud in Violation of 15 USC 78j(b) an17 C.F.R. 240.10b-5(b)**
**(against Credit Suisse)**

122.     Holdings repeats and realleges the allegations of paragraphs 1 through 121 above as if fully set forth here.

123.     Credit Suisse sought to create the false impression of a highly competitive Auction, when in fact Shawe's bid already had the most value.  It misrepresented the value of the competing bids to induce Shawe to raise Holdings' bid unnecessarily.

124.     On November 10, 2017, Credit Suisse suggested to Pincus that they should "guide Phil to '800s'" and Pincus agreed.  Credit Suisse then spoke to Atkins, acting as Shawe's agent, and misrepresented that Holdings was the "low bid now" and that Mr. Atkins should "bid his best number to position Phil [Holdings] to win."   Credit Suisse knew that Mr. Atkins would convey the misrepresentation to Shawe.

125.     Mr. Atkins informed Shawe that Credit Suisse had advised that Holdings was the low bid.

126.     Credit Suisse knew that Holdings' bid was not the low bid on November 10, 2017 when it made this misrepresentation to Shawe through Atkins.

127.     The fact that Shawe's bid was the most valuable and not the low bid is information that a reasonable Auction participant would find important in determining how much to bid.

128.     In response, on November 15, 2017, relying on the misrepresentation made by Credit Suisse, and believing that there were two other bona fide bidders with competitive offers, Shawe raised Holdings' bid to $710 million, with otherwise identical conditions.

129.     Having undertaken to make a representation about the amount of competing bids, Credit Suisse had duty to disclose material information regarding those competing bids to avoid misleading Shawe.

130.    Credit Suisse omitted material information necessary to make its statements to Shawe regarding the value of the competing bids not misleading.

131.    Credit Suisse's misrepresentations and omissions on the November 10, 2017 call about the value of other "bids" made in the Auction was "in connection with" the sale of a security because it directly influenced Holdings' bid for TPG shares and therefore the purchase price of the shares.

132.    Pursuant to the engagement agreement with TPG, Credit Suisse directly profited from the additional $70 million in purchase price.  Specifically, Credit Suisse received more than $1,000,000.00 in additional compensation based on the increase.

133.    Credit Suisse continued to mislead Shawe and Holdings and to cover up the true lack of competition by creating false bid comparison sheets that were submitted to the Court of Court as part of the approval process which made it appear that Pincus and his agents had placed a higher value on H.I.G.'s bids than was the case.  Those bid comparisons gave credit for H.I.G.'s seller note with a small discount when Pincus actually had given the seller note no credit as required by the Sale Order.

134.    Credit Suisse knew what other bidders were willing to pay, and Credit Suisse's statements and omissions about other bids were misrepresentations about the price at which Holdings could purchase the shares, or were at minimum materially and intentionally misleading. These misrepresentations caused Shawe to further increase Holdings' bid when it was already the highest bidder, and directly prevented Shawe from negotiating a transaction on more favorable terms.

135.    Credit Suisse had a duty to act toward Shawe with candor and fair dealing as an agent of an officer of the court.

136.    Shawe relied on the accuracy of the statements Credit Suisse made on the November 10, 2017 call and based upon them agreed to pay $770 million for TPG, increasing his bid a total of $70 million from the November 8, 2017 submission.

137.    But for Credit Suisse's misrepresentations, Holdings would have purchased TPG shares at the $700 million price of its November 8, 2017 bid, because Pincus would have been constrained by the Sale Order to maximize value and sell to Holdings at that price.

138.    Holdings relied on the untrue or misleading statements made by Credit Suisse in purchasing TPG shares for $770 million.

139.    As a proximate result of Credit Suisse's misrepresentations and omissions of material facts, Holdings was induced to purchase TPG shares at and inflated price to its detriment and suffered economic loss.

140.    As a direct and proximate result of Credit Suisse's omission of material facts, Holdings suffered damages, including, but not limited to, the $35 million of additional consideration paid for Elting's shares, the loss of the value of TPG shares and the costs of this action.

WHEREFORE, Holdings demands judgment in its favor and against Credit Suisse for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate

**EICHER LAW LLC**

 /s/Jeremy D. Eicher

Jeremy D. Eicher, Esquire (I.D. # 5093)
The Nemours Building
1007 North Orange Street, 4th Floor
Wilmington, Delaware  19801
Telephone: (302) 299-0959
jeicher@eicherlaw.com
*Attorneys TransPerfect Holdings LLC.*

Co-Counsel:

Russo PLLC
Martin P. Russo, Esquire
Robert Sidorsky, Esquire
Empire State Building
350 Fifth Avenue, Suite 7230
New York, NY 10118

November 9, 2022